The next case on the panel here is that of United States of America v. Stephen Baxter. Mr. Pelletier May it please the Court, John Pelletier from the Department of Justice on behalf of the United States. I'd like to ask to reserve three minutes for rebuttal, if I may. Thank you. This case, as you know, is about the Fourth Amendment's border search doctrine. Under that doctrine, customs officers can conduct routine custom searches. Let me stop you right there. That word routine, what is a routine inspection? In this case, we're talking about packages. What is a routine package inspection? Well, I don't think that this case requires the Court to delineate the outer bounds of routine versus non-routine because I think it's I think you're right, but we do need to know whether what we have here falls within whatever a routine inspection is. Well, this Court and others have regularly concluded that the search of mail and packages and the search of passengers and pat-downs are routine. That's always been the case. And so as in Hyde, that was routine because it was a search of a passenger, it was a pat-down. And in this case, the search of mail and packages is also routine. And that's I think in Ramsey itself, the Court itself, the Supreme Court said we don't have to address kind of more intrusive types of searches because this case is a search of mail. And so regularly, courts have concluded that mail, searches of mail and packages, is routine. So the question in this case is not whether the search here was routine or not routine. It was whether the border search exception applies at the customs border between the Virgin Islands and the United States Customs Territory. In Hyde, the search was reportedly justified by a desire to collect duties. What was the justification applicable here? Well, I think that – I don't know that that was the justification for the search specifically. Well, but the first half of your brief argues that. In fact, the first half of your brief argues that your opponent is right because it focuses solely on the customs, or not solely, but almost exclusively, on the legitimization of customs searches because of the need to collect duties. And going back historically in all your sites, focus on the need to collect duties. And that's not what we have here. Well, the scope of – the searches are justified because the duties are collected at that border. And therefore, routine customs searches that are of the scope, that are of the likelihood, to uncover dutiable merchandise and contraband are permissible under the border search exception. From the mainland into the territory is a collection of duties? Yes, there's duties that apply for goods that go from the territory of the United States into the Virgin Islands and goods that go from the Virgin Islands into the customs territory of the United States. That's explained in our brief. There's statutes that establish customs duties on merchandise going in both directions. But the main point of the notion of the importance – Let me stop you there again just so I understand. Your position is primarily, if not singularly, based upon the existence of the exception. Is that right? Our argument is that there's a well-established border search exception to the warrant requirement. And that that – I'm with you so far. And then that exception applies at the border between the Virgin Islands and the United States customs territory for routine customs searches, just as it does at the border between the United States and foreign jurisdictions, at the foreign border. My predicate statement was intended to lead me to this question. Are you saying, or is it your position, that the purpose of the inspection is not an issue or should not be an issue? No, I think Fourth Amendment law is clear that the subjective purposes of an inspection are not – that's the WHRE and the Wren Supreme Court decisions. The subjective motivations don't matter. What – the reason why the customs tradition is relevant is that it defines the scope of the permissible, warrantless, suspicionless – the scope of what's routine and what's permissible in a customs search. And it's searches that are of the scope that are likely to cover. That could be very helpful. I'm not sure I understood what you said.  Yes, Your Honor. So the subjective motivations of the individuals, the customs officers that are conducting the search, is not an appropriate consideration under the Fourth Amendment. That's the Supreme Court's decision in Wren and other cases. Okay. And the reason why this whole customs justification is significant is because it defines the scope and the tradition of what is reasonable under the Fourth Amendment for the scope of the permissible search, because at the – from the founding onwards, there was a – the – it was permissible to conduct searches at the customs border to uncover dutiable merchandise and contraband. And that's why routine customs searches that are of the scope that would uncover that, regardless of the subjective motivations of the searching officer, is permissible without a warrant and without suspicion under the border search. It doesn't matter whether this particular search was tethered to customs collection, although it might have been. Not at all. No. It doesn't matter. No, it doesn't matter at all, Your Honor. Because once you're in the border, then one needs to define what is the purpose of the border search. And the border search is, among other things, to collect duties. And if you have reason to believe a parcel may have merchandise for which duties may be owed, you can look in that parcel. That's the guide. That's the scope of the search, correct? The customs justification defines the scope of what can be searched at the border. So, for example, in many of these cases applying the border search exception, I believe in Glasser, Iraqu, Hyde itself, there was really a law enforcement rationale for conducting the searches at issue in that case. They were searching for evidence of criminal conduct. So it's really what the customs rationale establishes what's reasonable in terms of the scope of what can be searched at the customs border. And the subjective motivations doesn't matter for the searches that are conducted. Go ahead, Judge McKee. Well, as you said, the customs rationale defines the universe of permissible searches. But once you're in that universe, the subjective motivation of someone conducting a search within that universe is totally irrelevant as long as you stay within that universe. Correct, Your Honor. I think that's a correct explanation. How far does the CBP's authority extend in this regard? Is it the government's position that the CBP has the right or the authority to open any and every package, that is to say, non-letter mail that is sent from the U.S. to the V.I. without reasonable suspicion of probable cause? Constitutionally, that is permissible, Your Honor, yes. And that's the Supreme Court's decision in Ramsey says that mail can be searched without any suspicion at the border. And because that doctrine applies at the customs border between the Virgin Islands and the United States Customs Territory, as this Court concluded in Hyde, then yes, the customs officials can search mail without suspicion as it crosses that border. Now, the customs officials have actually taken steps to circumscribe that authority for themselves. They've said we're not going to be by regulation. They're saying we're not going to exercise it to the full extent that's permissible under the Fourth Amendment. We're not going to search first-class mail that's coming from the United States Customs Territory to the Virgin Islands without a warrant or consent. We're not going to search mail that appears only to contain correspondence without a warrant or consent. And for sealed letter-class mail, we're only going to search it if there's reasonable cause to believe it contains dutiful merchandise or contraband. This is, I'm sure, obvious, but we're not dealing with sealed letter-class mail here. Is that right? It's not in the record. That was not developed. I think it's highly unlikely because sealed letter-class mail is defined as at the rate of a letter. And here was a gun and sweater being mailed in. And it was the record does establish it. It had to be in package form somehow, right? Excuse me, Your Honor? It would have had to be in package form. It was priority mail. So we know that it was not first-class mail. We know it was priority mail and that it weighed well over 16 ounces. So it would be highly unlikely, although I don't think there's testimony to the effect that it was not letter-class mail. I think that's the only reasonable inference from the record. You argue that in your brief you said we should not get involved in balancing governmental versus privacy interests because the search from your view is categorically reasonable. So what is our analytical framework? The analytical framework, excuse me, Your Honor, the analytical framework is that the border search doctrine allows routine custom searches at the border. That doctrine applies under Hyde at the border between the United States Customs Territory and the Virgin Islands. And therefore, it permits the searches of the mail in this case because obviously under Ramsey. But Hyde then went on to invoke balancing, right? Yes, Your Honor.  And please feel free to be candid. Do you think we didn't quite get it right or maybe we went a little too far or perhaps engaged in a superfluous exercise in invoking balancing? I think it's best understood as saying, look, the justification for the border search exception applies equally here and therefore the border search doctrine applies. And then saying, and we're confirming that by a balancing of the interests. And I think that if you look at it. That's what Hyde did, right? Yeah. And I think that if you look at it, for example, the Wyoming versus I think it's the Supreme Court, that was whether the search there was a permissible automobile exception. And the court said, yes, the automobile exception which permits the search of automobiles with probable cause applies here and permits this search. But, and then it went on to say, and even if we conducted a new balancing test here, we would reach the same result. We view Hyde as effectively doing that same, taking that same approach. But even if Hyde were to be read as saying, well, we need to conduct the balancing to determine the permissibility of the search. Because Hyde has then conducted that balancing, this Court doesn't need to do it anew. I mean, for example, the Supreme Court has said when it's conducted balancing, for example, at the border for, to determine the permissibility of more intrusive searches, for example, holding someone before they have a bowel movement for several hours, the court said that you need reasonable suspicion and it did a balancing. But now, now that the Court's decided that, Court's applying that, don't conduct a balancing in every case, the Court struck the balance in that case and now this Court and the Supreme Court applies kind of a categorical rule. And that's what this Court should do in this case because, number one, we don't think that Hyde conducted a balancing to actually determine what to do. It was just a confirmation. But even if Hyde did conduct a balancing. Kennedy, or didn't have to. It didn't have to. But even if it did, even if you were to read it as the Court thinking it did have to, since it did that balancing, now this Court doesn't have to do the balancing again. I don't want to oversimplify your position. But would you say that to sustain your position, it's enough for this Court to look to its precedents in, and I've been struggling to figure out if I get the pronunciation right, but it's Izaruku and Hyde.  I mean, does that do the job? Yes, it does, Your Honor. Do those two cases do the heavy lifting? Yes. I think if you apply those two cases, they resolve this case straightforwardly. One last question. Assuming that we don't think that they resolve this case straightforwardly, what about the position that was taken by the district court here in St. Croix, in Barconi? Does good faith carry the day for you otherwise? It would have, but we did not raise that, so it's been waived. We could have raised that because of the regulations. Barconi, I can get into why the reasoning of that decision. I expect that it's not necessary. Thank you, Your Honor. Judge McKee, do you have questions? No, not really. This is like thinking through this, and actually I'm sitting here looking at the Hyde As I'm listening to this, it does seem to me that the doctrine of the customs search endemic within that is a balancing test. It's just not pronounced or it's not stated, but the result of the balancing that the Supreme Court has done all these years is the customs test, and that's the universe that we're in, to get back to the analogy that I was using earlier. But that's just a thought that I had, not really a question. Thank you very much, Mr. Talkevich. Mr. DeRuzzo. Good morning, Your Honors. May it please the Court, Joseph DeRuzzo on behalf of the appellee, Mr. Stephen Baxter. I'd like to address and start off with some things I think we all can agree are true. The Fourth Amendment applies in the continental United States. The Fourth Amendment applies in the Virgin Islands by operation of the revised Organic Act. If the search had occurred in the continental United States, the search would have been illegal. If the search had occurred in Puerto Rico, the search would have been illegal. The USVI is in a separate customs zone. That customs zone is for administrative convenience. But a customs zone is not the same thing as an international border. Just yesterday when I was flying down here from Miami, went to Miami International Airport, I walked in, cleared security, got on a plane just like I do, often fly between here or Miami-St. Croix or St. Thomas, and I thought to myself, there's absolutely nothing different between flying from Miami to St. Croix than flying to Miami to New York, Philadelphia, or Washington, D.C. Experientially, it might be the same, but Congress elected to enact a customs border from the time the Virgin Islands was acquired from the Danish. And so there's a border here that's been existing for 102 years. But that customs border, which I believe the court on high focused on, focused on the fact that one, there is a federal statute that allowed the searches from the Virgin Islands into the mainland United States, and there was a regulation that allowed the same. That is not the case vice versa. There is no federal statute that allows a search inbound. The only authority for an inbound search is the 145.1, 2, and 3, which formed the basis of the case today. And I'd like to turn the Court's attention to the fact... But the presence or absence of a statutory permission wouldn't necessarily save a search from being unconstitutional. So what's the relevance of this? What's the need to even look at the existence of authority to conduct the search statutorily if we're in constitutional land? Well, one, I think the fact that there isn't a statute or a regulation authorizing militates in favor of determining that the search is unreasonable. Well, let's work with that then. If that's your position, if the existence of a regulatory or statutory scheme justifies the search, here we have a scheme that contemplates duties being collected both on outgoing packages and incoming packages. And there's a scheme that allows for the enforcement of the customs laws. Indeed, federal law enforcement through CPB participates in this collection process. So there is a statutory scheme that is being enforced. So if there's a condition that a statutory scheme, from your point of view, could save a search, it doesn't want to exist here. Well, one, I would like to challenge Your Honor's supposition that the statutory scheme operates to vitiate the Fourth Amendment. But putting that aside, I would submit that absent an appropriate statutory and regular story scheme that authorizes the action here, then you fall back into generic Fourth Amendment land where an ex parte Jackson would control. An ex parte Jackson is clear searches of mail are unreasonable, absent a warrant. An ex parte Jackson is also clear that regulations that attempt to, you know, denude the Fourth Amendment are inapplicable. It can't be done. What about Ramsey? Ramsey allows the search of parcels of mail. Well, that is true. But Ramsey is at a true international border. But the border search requirements, whether at a true international border, as you call it, or the customs border here, the interests are the same, contraband, danger, collection of duties. Correct? I would say no to the first two, yes to the third. The Court needs to keep in mind that the sovereign controls both sides of this custom border and that the purpose of dangerous items, illegal items, that purpose exists no matter whether you're in the United States, whether I'm going from Florida to Philadelphia, or if I'm going from Florida to the Virgin Islands. This overarching need for to ferret out illegal contraband, that is a general proposition that the government has writ large. But that doesn't justify minimizing the Fourth Amendment based upon an inbound article and effect. Why is there a difference between inbound and outbound? We're bound by Hyde. You're bound by Hyde. Okay. Hyde permits searches outbound. What's the difference? So are you contending that a warrant is going to be required before Federal authorities may open any package sent from the mainland U.S. to the V.I.? Yes. And to go back to your question or comment, Judge Schwartz, one, I don't believe Hyde controls. And at the Joint Appendix, page 145, the government conceded as such that Hyde does not control the specific authority on this. Both Judge Gomez in the decision below and Judge Lewis found that Hyde does not control. And Hyde dealt with inbound person that had a regulation on point. And a statutory scheme on point. Here, there is no statute that allows outbound from the United States into the Virgin Islands. And the only authority is the regulation, which I believe violates the non-delegation and violates the APA. No, it did not. Did you write that below? Half of your brief, I think, and it's a very thoughtful argument, but I'm wondering if it's not waived. Because Gomez never mentions the APA. You spend a lot of the time in your brief arguing the APA and whether the regulation is invalid. Did you raise that before, Gomez? No, I was not trial counsel, Your Honor. We didn't ask that. I understand. It has absolutely nothing to do with our analysis. Your Honor, I believe this Court can affirm by any basis the government, which is usually the appellee, can often for a justification. When you're done with this, answer my question. Was it raised below? I would say it was not raised by the parties below, but by operation of the government raising the regulation in its briefing in response to Judge Gomez's questions at the oral argument and the supplemental briefing. So it was a government argument. How does a government argument help you? How can we extrapolate from a government argument a conclusion that you raised the issue? Judge, if the government raises a regulation to support its position, I believe it's reasonable for you to respond, but I don't understand that you've responded in any way, either by making a record or by way of argument. Well, Your Honor, I would submit that when the government raises a regulation, by its very nature, it puts all those regulatory considerations on the table. Well, not if the Court does not consider it in the order that's under review. The Court never considered that. Our purpose is to review a specific order, and the Court did not, in the opinion justifying that order or explaining the order, the Court never discussed it. Well, Judge Meek, I believe Judge Gomez specifically stated that the regulation that the government travels under conflicted with the Title 39 regulations. And to me, that, although Judge Gomez did not say arbitrary and capricious per se, that's effectively the analysis that he engaged in by raising the conflict between the domestic mail manual and the fact that priority mail is sealed and is not subject to inspection. Okay. So going back, to me, this case is not controlled by Hyde because, as the government admitted below and as Judge Gomez noted, that this is a different set of circumstances. This is not from the United States Virgin Islands into the mainland. This is not controlled by the statute that allows the search from the United States Virgin Islands into the mainland and the regulations interpreting that. In your brief at page 38, note 20, I don't expect you to know exactly what that is, but you say the analytical framework of Hyde is sound. So if you think Hyde's framework is sound, why shouldn't we apply it? You want us to just ignore it because it's different. Your Honor, and I knew you were going to ask that question, and I'm sure I'm mispronouncing it. This would be a really good answer, then. Really good question. It's Irizakou. I believe Judge Alderson, in his opinion when writing for the Court, stated this. In doing so, the Court committed the logical fallacy of dicto suppositere, fallacy of the accident, which occurs, quote, when a general rule is applied to exceptional circumstances. And Judge Alderson proceeded to quote to a book, Logic for Lawyers, that he authored. My Alderson, yes. That he authored. And I would submit that's exactly what we have here. We have a general rule, international border searches, that the government is trying to fit, trying to shoehorn, trying to graft upon the U.S. Virgin Islands. And those cases are inapplicable. You can't take those broad-based positions, Ramsey, Carroll, and their progeny, and then shoehorn them in to the United States Virgin Islands, which we all know is a unique little animal under Article IV of the Constitution. And that what we have when Congress applied the Fourth Amendment in full to the Virgin Islands by operation of the Revised Organic Act, we have Congress saying that, hey, the Fourth Amendment applies here. We all know the Fourth Amendment does not apply extraterritorially. And as a result, when coming into the country through a foreign – from a foreign destination, you don't have those Fourth Amendment protections. But that's not the case in the Virgin Islands. But by extension, then, you would ask to say Hyde was wrong, and you would want us to overturn Hyde. I don't think this Court needs to opine on Hyde, given that it's – it's – How could we – it's the same border that's being crossed. Your distinctions are inbound versus outbound. Yes. Regulation or statutory authority. Those are the distinctions. Your argument to us right now is Hyde is wrong. Well – And so you're saying that the reason that the border is – the border is – this shouldn't be treated like an international border. Do I understand your argument correctly? I admit that this Court is bound by the prior precedent ruling and can't overturn Hyde, but given that Hyde has, admittedly, different facts, different statutory scheme, different regulatory scheme, this Court – Judge, if you wanted to issue a concurring opinion or a debaunty opinion why Hyde is – was wrongly decided in the first time around, I would welcome it. Because the more I think about it, I think, yeah, Hyde probably got it wrong. I know Hyde didn't address the regulatory framework in reference to the AAPA or now that Judge Alito has breathed new life into non-delegation with his concurring opinion in Gundy. So I think there is – as a school of thought, you know, legally evolves, I think we could reconsider Hyde, and I think that would be appropriate, and I'd welcome that opportunity. But you recognize that we're bound by it. But I recognize that you're bound by it, but you can distinguish Hyde on those very important issues, the different statutes, the different regulatory scheme. And the fact is, when I'm leaving here today, I'm going to go to the airport and I'm going to be interviewed by a customs person, and up until a year and a half, maybe two years ago, I had to fill out the same little form that you fill out when you arrive internationally. Well, that form no longer exists, but I still have to deal with the same customs person. That doesn't happen when you come into the Virgin Islands, leaving the United States, and for the purposes of mail. There is nothing when I go to the post office that says when I mail something from Miami into the Virgin Islands that is any different from mailing from Miami to Philadelphia. So I would submit that these key distinctions inform the Court's decision-making, and I think in this case that both Judge Gomez's opinion and Judge Lewis's opinion in the Barraconi case are well-reasoned, well-founded, and that the Court should affirm the decision below. That's especially so since the government has waived any reliance upon good faith, has no mention of Leon, which Brother Counsel has noted. So that issue was not preserved. And I think this Court should be mindful of to give a sound bite from Chief Justice Roberts in Riley. It's very simple. Get a warrant. The mail came in. There was no need. There was no exigent circumstance. Just like in the Lei-Uwen case, if I'm pronouncing that correctly, you got it? It would take, what, half a day? Maybe a little more to get a warrant to execute it? This is not, you know, asking too much of the government. Indeed, in the my Brother Counsel's reply brief at page 22, he quotes that, the incidence of openings of first-class mail arriving in the USBI from the Customs Charity of the United States would be relatively low. If this is relatively low, which I believe the record evidence does not support that, I believe the record evidence supports that CBP is doing this as a matter of putting that aside. If this is true, this is relatively low, what is the inconvenience? How much is it asked to just get a warrant? And because I think in this case, you know, to be perfectly frank, I think, you know, there was probable cause, and I think a warrant probably could have been received and it would have been done properly. You know, there would be no there there. But I don't think that it's asking too much. And that would, you know, big picture uphold the Congress's intent that the Fourth Amendment applies with equal force in the Virgin Islands. So that being said, thank you for your time and ask that the decision below be affirmed. Judge McKee, do you have any further questions? No, no, thanks for asking, but I'm okay. All right. Thank you very much, Mr. Jones. Mr. Palagianari. Thank you, Your Honor. I just would like to reiterate the relatively straightforward manner in which our view, the Court can and should resolve this case. Hyde has already held that there is a customs border at the, between the United States Virgin Islands and the United States Customs Territory and that the Border Search Doctrine applies there. The only grounds for distinguishing Hyde are that Hyde involved a passenger, whereas this involves mail, but it's very clear that the Border Search Doctrine applies to mail and passengers equally. The Ramsey case made this specific point, saying that if someone, if customs officers can search a piece of mail that's carried by a person going across the border, it would make no sense not to allow customs officers to apply to search mail, that's packages that are mailed. Then the other distinction is outgoing versus ingoing, and this Court has expressly rejected that distinction at the international border in Israq. So the combination of Hyde and Israq resolves this case based on this Court's straightforward precedent. Unless the Court has any additional questions, we'll rest on our briefs. Do you have any response to your adversary noted something at JA 145 in a comment about Hyde? Are you familiar with what your adversary was talking about there? Some kind of concession? I'm not, Your Honor. I don't know exactly, so I don't want to speculate. But we've certainly always taken the position that the search in this case was permissible under Hyde. And with respect to your adversary's statement that Hyde is also distinguishable because Hyde had a regulatory and statutory scheme that allowed the search, is he correct that there is no such equivalent scheme here? Now, the Court in Hyde did discuss the statute that authorized searches of passengers coming into the Virgin Islands. In our view, that discussion was relevant because it was in the context of the confirmatory balancing of the interests. And the Court said, well, look, there's notice. Under the statute, there's notice. It shows the government's interest. But the existence of that statute was not necessary for the Court's constitutional ruling that the border search exception applies at the customs border. And I think that's consistent with Fourth Amendment law generally. It's generally a statutory – the constitutional reasonableness of a search under the Fourth Amendment is determined by Fourth Amendment doctrine, not by the existence of a statute that authorizes the search. And we cite the Supreme Court's decision in Cibron where New York State passed a statute saying you can conduct stop-and-frisks, and the defendant there asked for that statute to be found constitutionally invalid on its face. And the Supreme Court said, we're not going to address whether the statute's invalid or not. We're looking to the search and determine whether the search is reasonable under the Fourth Amendment. And that's the case here as well. The Court should look to the search itself and determine whether the search is reasonable under the Fourth Amendment under the border search exception, regardless of whether there's any statutory or regulatory authorization. But in this case, there actually is a regulatory authorization. There's the customs regulations that permits the searches of mail, and that's always – that's also in the larger context of the statutes that authorize custom searches generally. Thank you, Your Honor. Thank you very much. I thank you to both the counsel for their fine briefing and for their helpful arguments here today. It's an interesting case. We'll take it under advisement. And I'll also request that a transcript be prepared of these oral arguments. Thank you all, and I'll ask the clerk to adjourn the proceedings.